## <u>CONTINUATION OF APPLICATION FOR SEARCH WARRANT</u>

1.      I am a Special Agent (SA) with the Department of Homeland Security (DHS),

Homeland Security Investigations (HSI), assigned to HSI Sault Ste. Marie, Sault Ste. Marie,

Michigan, hereinafter referred to as HSI Sault Ste. Marie, and have been so employed since

October of 2008.  I was previously employed with the U.S. Customs and Border Protection /

Office of Field Operations (CBP/OFO) as an Officer for five years.  As part of my duties as an

HSI SA, I investigate criminal violations relating to child exploitation and child pornography

including violations of 18 U.S.C. 2252 and 2252A - Production, Distribution, Receipt and

Possession of Child Pornography, 18 U.S.C. § 2241(c) - Aggravated Sexual Abuse, 18 U.S.C.

2422(b) - Coercion and Enticement and 18 U.S.C. § 2251(a) and (e) - Sexual Exploitation of

Children pertaining to the illegal production, distribution, receipt and possession of child

pornography, in violation of 18 U.S.C. §§ 2252 and 2252A.  I have received training in the area

of child pornography and child exploitation, and I have had the opportunity to observe and

review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in many forms

of media, including computer media.

2.      I provide this information in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the following item (hereinafter

referred to as the "TARGET DEVICE"), which is described in Attachment B of this affidavit,

belonging to Christopher MASTERSON, for contraband and evidence, fruits and

instrumentalities of violations of 18 U.S.C. 2252 and 2252A - Production, Distribution, Receipt

and Possession of Child Pornography, 18 U.S.C. § 2241(c) - Aggravated Sexual Abuse, 18

U.S.C. 2422(b) - Coercion and Enticement and 18 U.S.C. § 2251(a) and (e) - Sexual Exploitation

of Children.

a.      One Samsung Galaxy S20 Cellular Telephone and the Secure Digital (SD) card within located in the seized evidence room in the office of HSI Sault Ste. Marie, Michigan

3.      I am familiar with the information contained in this Application based on my conversations with other law enforcement officers involved in this investigation, as well as those who have engaged in numerous investigations involving child pornography.

4.      Because this Application is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. 2252 and 2252A - Production, Distribution, Receipt and Possession of Child Pornography, 18 U.S.C. § 2241(c) - Aggravated Sexual Abuse, 18 U.S.C. 2422(b) - Coercion and Enticement and 18 U.S.C. § 2251(a) and (e) - Sexual Exploitation of Children are presently located in the TARGET DEVICE.  Where statements of others are set forth in this Application, they are set forth in substance and in part.

5.      Based upon information gained during the investigation described more fully below, I respectfully submit there is probable cause to believe that evidence of violations of federal law, including 18 U.S.C. §§ 2252, 2252A, 2241(c), 2422(b) and 2251(a) and (e) are contained within the TARGET DEVICE.

## BACKGROUND OF THE INVESTIGATION

6.      In my training and experience, I have learned that Facebook is a popular free social networking website that allows registered users to create profiles, upload photos and video, send messages and keep in touch with friends, family and colleagues.  Users have unique

individual accounts and are able to log in using electronic devices that are capable of connecting to the internet.

7. Facebook also provides a service known as Facebook Messenger which is a free instant messaging service and software application which provides text and voice communication. Integrated with Facebook's web-based Chat feature and built on the open MQTT protocol Messenger lets Facebook users chat with friends both on mobile and on the main website. Users are able to send text and multimedia content to one another using this platform.

8. In my training and experience, I have learned that Snapchat, Inc. is a mobile application made by Snap, Inc. and is available through the Apple iPhone app store and Google Play. The application provides users a way to share photos, videos and text. Subscribers obtain an account by downloading the free Snapchat application to their mobile media device and registering an account with Snapchat.

9. Snapchat users can take photos or videos "Snaps" using their camera phone in real-time and then select which of their friends to send the message to. Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after it is opened in the case of the recipient). Users are able to save a photo or video they have taken locally to their device or to "Memories", which is Snapchat's cloud-storage service.

10. Another feature available to Snapchat users is the chat feature. A user can type messages, send photos, videos, audio notes and video notes to friends within the Snapchat application. A user sends a chat message to a friend and once it is viewed by both the sender and the recipient, and both parties swipe away from the chat screen, the message will be cleared.

Within the Snapchat application itself, a user can opt to save part of the chat by tapping on the message that they want to keep.  The user can clear the message by tapping it a second time.

11.     When registering a Snapchat account the user must select a username that is a unique identifier associated with a specific user on Snapchat and cannot be changed by the user once selected.  A user can also select a vanity name which is not a unique identifier and can be changed by a user or that user's friends to indicate how the user will appear within the Snapchat application.

12.     I know that social media applications are accessible and operated from "smart" cellular telephones.

## PROBABLE CAUSE TO SEARCH THE TARGET DEVICE

13.     This investigation includes the exchange of numerous electronic messages collected from social media accounts utilized by Christopher James MASTERSON from Myrtle Beach, South Carolina and others to include a minor victim (hereinafter referred to as MV-1) who resides on land held in trust by the Sault Tribe of Chippewa Indians in Sault Ste. Marie, Michigan.

14.     I reviewed the content of MV-1's Facebook and Snapchat social media accounts upon MV-1's mother's voluntary relinquishment of MV-1's cellular telephones.  I also reviewed the content of the actual accounts throughout the course of this investigation.  MV-1's mother explained that MV-1 was using each of the aforementioned social media accounts to communicate with MASTERSON concerning the exchange and live streaming of sexually explicit pictures and videos and about his travel to the Western District of Michigan (WDM) for the purpose of engaging in sexual acts with MV-1 and his/her younger minor siblings.

15.     On December 3, 2018, MV-1's mother contacted the Sault Tribal Police, Sault

Ste. Marie, Michigan and stated that an adult male, identified only as "Chris", was communicating with MV-1 on his/her cellular telephone.  MV-1's mother voluntarily relinquished MV-1's cellular telephone to the Sault Tribal Police, Sault Ste. Marie, Michigan. The Sault Tribal Police made an unsuccessful attempt to forensically examine the telephone.

16.     On October 4, 2019, MV-1's mother intercepted a "smart" cellular telephone that was sent via FedEx to MV-1 at their residence from MASTERSON.  MV-1's mother voluntarily relinquished this cellular telephone to the Sault Tribal Police.  The FedEx shipping label indicates the following information:

      a.     Christopher MASTERSON

      b.     1942 Tree Circle, Myrtle Beach, South Carolina 29575

      c.     Ship Date: October 2, 2019

      d.     To: MV-1's name

      e.     MV-1's residential address

      f.     (843) 283-6505

      g.     Thursday, October 3 8:00 p.m.

17.     MASTERSON is registered on the South Carolina Sex Offender Registry (SOR). The SOR indicated that MASTERSON was 32 years of age and that the address on the shipping label as previously documented in paragraph #16b of this affidavit matched his registered address.  The SOR also indicates the following information:

      a.     Conviction Date: January 14, 2008

             Conviction State: Illinois

             Statute: 12-16(c)(1)(l)

             Offense: Aggravated Criminal Sexual Abuse / Victim Less Than 13

     b.     Conviction Date: July 16, 2013

           Conviction State: Illinois

           Statute: 730 ILCS 154/30

           Offense: Fail to Report Address Change

18.     On October 19, 2019, I was contacted by MV-1's mother who advised that MV-1 stated that MASTERSON was in route from South Carolina to Sault Ste. Marie, Michigan to meet him/her to engage in "sex".  I met with the owner of the Plaza Motor Motel, 3901 Interstate 75 Business Spur, Sault Ste. Marie, Michigan who confirmed that MASTERSON had a reservation for one room for that night and the next.  I met with MV-1's mother and MV-1 at the office of the Sault Tribal Police.  MV-1 was in possession of another cellular telephone and was actively communicating with MASTERSON via electronic messages via the Facebook social media platform.  MASTERSON was communicating from an account identified by a username of "Beth Tayler".  MASTERSON sent an electronic message to MV-1 that indicates that he travelled through Ohio and was arriving in southern Michigan.  MV-1 stated that MASTERSON's trip was planned for weeks in advance.  MV-1 also stated that "I love him (MASTERSON) with all of my heart" and "I know I'm addicted to him (MASTERSON)."  MV-1's mother voluntarily relinquished MV-1's cellular telephone.  MASTERSON arrived at the Kewadin Casino in Sault Ste. Marie, Michigan and met with MV-1's mother.  MV-1's mother later advised that she telephonically made arrangements to meet MASTERSON with MV-1 at a restaurant located adjacent to her mother's house in Sault Ste. Marie, Michigan where they were located.  The Sault Tribal Police and I observed MASTERSON slowly driving his pickup truck in front of MV-1's grandmother's house on two occasions.  MASTERSON parked his truck behind the restaurant and exited the vehicle.  The Sault Tribal Police and I encountered

MASTERSON and conducted a noncustodial interview.  MASTERSON confirmed that his travel to Sault Ste. Marie, Michigan was to meet with MV-1.

19.     On October 22, 2019, I met with MV-1's mother who presented electronic communications on her cellular telephone between MASTERSON and MV-1 from July 31, 2019 through October 3, 2019 and between MASTERSON and herself on October 19, 2019.  October 19, 2019 is the date that MASTERSON arrived in Sault Ste. Marie, Michigan as previously documented in paragraph #18 of this affidavit.  A caption at the top of the screen above the messages depicts "Conversation with James M??? (MV-1's Name) Not Cool Friend".  Below are five samples of the messages from MASTERSON:

a.     MASTERSON sent a "selfie" picture of himself that depicts his exposed lower chest to his upper forehead.  MASTERSON is not wearing any clothing in this picture.

b.     "R u going to call me back"

c.     "I guess I'm going to go back to the hotel"

d.     "I still want to talk to him/her (MV-1) on video though"

e.     "Can you have him/her (MV-1) call me on your phone please"

20.     MV-1's mother's telephone indicated that she missed a telephone call from MASTERSON on October 20, 2019 from MASTERSON's telephone number identified as 843-283-6505 as previously documented in paragraph #16f of this affidavit.

21.      In October of 2019, MV-1's cellular telephone as documented in paragraph #15 of this affidavit was forensically examined by the Sault Ste. Marie Police Service, Internet Child Exploitation and Technological Crime Unit, Sault Ste. Marie, Ontario.  On October 23, 2019, I received a corresponding forensic extraction report that includes exchanged electronic

communications between MV-1 and MASTERSON via a Snapchat social media account identified by username "jamesryan0328"/"James Ryan" from November 29, 2018 through December 2, 2018.  Below are eleven samples of messages from MASTERSON that pertain to the online sexual exploitation of children:

      a.    "When your naked"

      b.    "Well thx for giving up that pussy"

      c.    "But remember that body is mine and only mine I am claming ownership on that ass"

      d.    "Can I lick it too"

      e.    "Are you wet yet"

      f.    "Awe I sorry I scratch your back pussy and lick it"

      g.    "That's pussy licking"

      h.    "It really says I love fucking you"

      i.    "Do you want me to call or are you busy still??"

      j.    "Can I call you"

      k.    "So cab u text tho"

22.    On October 29, 2019, Victim Assistance Specialist (VAS) Diane Siegel, assigned to HSI Grand Rapids, Michigan, conducted a forensic interview of MV-1.  MV-1 made the following statements:

      a.    That MASTERSON initially met him/her via a social media platform when he/she was 13 years of age.

      b.    That MASTERSON requested pictures that depict him/her "nude" for his sexual stimulation when performing masturbation.

   c.  That he/she electronically sent MASTERSON a picture that depicts his/her exposed chest/breasts and his/her genitalia.

   d.  That he/she electronically sent sexually explicit pictures that depict him/her to MASTERSON on approximately three occasions via his/her cellular telephones.

   e.  That MASTERSON sent him/her pictures of his exposed penis on multiple occasions.

   f.  That MASTERSON convinced her to engage in sexual activities with his/her minor cousin when they were both 15 years of age while MASTERSON observed from his/her cellular telephone via a live video call.

   g.  That MASTERSON told him/her that they would engage in "sex" in his motel room when visiting Sault Ste. Marie, Michigan as previously documented in paragraph #18 of this affidavit.

   h.  That MASTERSON inquired if he/she would engage in sexual activities with other minor children.

   i.  That MASTERSON observed MV-1 performing masturbation live via a video cellular telephone call.

   j.  That MASTERSON showed him/her two "sex toys" that he purchased for her via a live video cellular telephone call.

   k.  MV-1 positively identified MASTERSON via a printed picture form the SOR that depicts him.

23.  MV-1 later told the Sault Tribal Police and I that MASTERSON made him/her and one of his/her younger siblings "rub" each other's genitalia while MASTERSON observed

via live video telephone calls at their residence and their grandmother's residence as previously documented in paragraph #18 of this affidavit.  That this younger sibling (hereinafter referred to as MV-2) was nine years of age at the time.

24.     On June 18, 2020, Forensic Interview Specialist (FIS) Amy Allen, assigned to HSI Headquarters, Washington D.C., conducted a forensic interview of MV-2 who made the following statements:

     a.     That he/she is now 10 years of age.

     b.     That when he/she was eight or nine years of age, MASTERSON had MV-1 and MV-2 remove their clothes on more than one occasion and touch each other's genitalia while he observed via live video telephone calls.

     c.     That these occurrences occurred when MV-1 and MV-2 were in Sault Ste. Marie, Michigan.

25.     Upon conclusion of the forensic interview of MV-2, MV-1's mother voluntarily relinquished another cellular telephone from MV-1.  MV-1's mother displayed exchanged electronic communications from June 9, 2020 and June 16, 2020 between MV-1 and MASTERSON via Facebook.  MASTERSON's account was identified as "Chris James".  Below are five samples of messages from MASTERSON that pertain to the sexual exploitation of children:

     a.     "But I want you to get Dick and you will not sooo"

     b.     "I need to cum some how"

     c.     "Oh how is (MV-2's first name) freaky ass"

     d.     "Make him/her cum"

     e.     "I want to watch you finger him/her (MV-2) and eat him/her (MV-2)"

26.     FIS Allen, VAS Siegel and I then met with MV-1 who made the following statements:

a.     That last night, MASTERSON told MV-1 that he wanted him/her to make MV-2 "cum" via electronic messages from his Facebook account identified as "Chris James" as previously documented in paragraph #25 of this affidavit.

b.     MV-1 identified two Facebook accounts that he/she used to communicate with MASTERSON.

27.     On June 19, 2020, I assumed the online identity of MV-1 via one of his/her relinquished Facebook accounts as previously documented in paragraph #26b of this affidavit and electronically communicated with MASTERSON via his Facebook account identified as "Chris James" as previously documented in paragraphs #25 and #26a of this affidavit.  Below are seven samples of messages from MASTERSON that pertain to the sexual exploitation of children:

a.     "I kinda am feeling hormones"

b.     "To cum"

c.     "His/Her (MV-2) pussy is fire too"

d.     "Can you vc (video chat)"

e.     "I liked it when you finger him/her (MV-2)"

f.     "Oh ask him/her (MV-2) if my dick makes him/her (MV-2) hot"

g.     "Tell him/her (MV-2) it will be worth it"

28.     On April 25, 2021, the City of Sault Ste. Marie Police Department and I encountered MASTERSON and MV-1 walking together on 3 Mile Road in Sault Ste. Marie, Michigan when MV-1 was 17 years of age.  MV-1's mother retrieved MV-1 and discovered that

he/she was in possession of another cellular telephone.  MV-1's mother discovered a picture of

MASTERSON and MV-1 together within this telephone that depicts MASTERSON from his

exposed abdomen upward with a dark blue colored blanket partially covering his bare chest.

MV-1 is depicted from his/she shoulders upward and appears to be wearing a gray colored shirt.

MV-1 stated that the picture was taken within a motel room at the Gray Wolf Lodge in

Manistique, Michigan where MASTERSON leased the room.  MV-1's mother relinquished the

telephone.  When interviewed, MV-1 made the following statements:

a.      That MASTERSON purchased this telephone via MV-1's Amazon (e-commerce company) account so the shipping label would indicate MV-1's contact information instead of his own.

b.      That MASTERSON arrived in Sault Ste. Marie, Michigan in January or February of 2021.

c.      That MASTERSON has "been here for months upon months."

d.      That MASTERSON has been residing in his truck primarily throughout Chippewa County, Michigan for numerous days.

e.      That MASTERSON uses restrooms at gas stations to bathe.

f.      That he/she was with MASTERSON on numerous occasions since his arrival.

g.      That he/she was with MASTERSON on his birthday (March 28, 2021).

h.      That since MASTERSON's arrival in Sault Ste. Marie, he's "been here the whole entire time."

i.      That MASTERSON transported him/her throughout the Upper Peninsula of Michigan and to Wisconsin since his arrival in Sault Ste. Marie, Michigan.

      j.      That MASTERSON's truck is currently inoperable and in need of repairs.

29.      I transported MV-1 and his/her mother to a secluded and wooded area on the eastern end of 9 Mile Road in Dafter, Michigan and discovered MASTERSON's parked pickup truck.  I observed a cooler and cookware located in the bed of the truck which are indicative of camping.  In addition, I also observed MV-1's bicycle as well.

30.      On April 26, 2021, I met with a resident of Pickford, Michigan and his/her adult friend.  They confirmed that they encountered MASTERSON and MV-1 on April 22, 2021 in Pickford, Michigan.  They stated that MASTERSON arrived at the resident's house and requested to borrow tools to repair his pickup truck that was located within a nearby secluded wooded area.

31.      I contacted the Horry County Sheriff's Office (HCSO), Conway, South Carolina who provided a copy of a state issued arrest warrant for MASTERSON concerning violations of the following law:

      a.      "Offense: Sex/Sex Offender Registry Violation, fail to register – 1st offense"

            "Offense Code: 2606"

            "Code/Ordinance Section: 23-03-0470(A)"

32.      On April 28, 2021, the Chippewa County Sheriff's Office (CCSO), Sault Ste. Marie, Michigan, located MASTERSON's pickup truck at the same location as documented in paragraph #29 of this affidavit.  The CCSO located broken eggshells on the ground and the following items within the pickup truck:

      a.      Groceries to include food items, plastic bottles and paper plates.

      b.      Toiletries to include toilet paper.

      c.     Clothing

      d.     Pillows

      e.     An opened box of pregnancy tests

33.     On April 29, 2021, I met with MV-1's minor friends who made the following statements concerning previous telephonic and electronic communications with MASTERSON:

      a.     That approximately three years ago, MASTERSON stated that he was going to kidnap and "rape" MV-1 and one of these minor friends.

      b.     That MV-1 told him/her that MASTERSON was living out of his pickup truck in the local area to avoid detection by law enforcement.

      c.     That when MV-1 visited him/her at his/her residence, MASTERSON would talk to MV-1 via live video telephone calls.

      d.     That MASTERSON would talk about visiting Sault Ste. Marie, Michigan and engaging in sexual activities with other minor boys/girls.

      e.     That MASTERSON would commonly contact him/her via social media and inquire about MV-1's location.

      f.     That MASTERSON talked a lot about MV-2 and MV-1's youngest sibling (hereinafter referred to as MV-3).

34.     On April 30, 2021, I was contacted by MV-1's mother who stated that MV-3 disclosed that MASTERSON sexually assaulted him/her at their residence on land held in trust by the Sault Tribe of Chippewa Indians in Sault Ste. Marie, Michigan.  MV-3 was five years of age.  I responded to their residence and MV-3 restated that MASTERSON sexually assaulted her around "Easter Friday" at their residence.  MV-3 provided details of the assault.  MV-3 stated

that MASTERSON placed his cellular telephone on a nearby windowsill and faced it in the direction of where and when the assault occurred.

35.    On May 3, 2021, Forensic Interview Specialist (FIS) Amy Allen, assigned to HSI Headquarters, Washington D.C., conducted a forensic interview of MV-3.  MV-3 made the following statements:

    a.    That MASTERSON sexually assaulted him/her and that a "bunch of pictures" were taken during the assault of his/her genitalia with a cellular telephone.

36.    I conducted an interview of MV-1 upon the conclusion of the forensic interview of MV-3 as previously documented in paragraph #35 of this affidavit.  MV-1 made the following statements:

    a.    MV-1 stated that MASTERSON telephonically talked with MV-3 on numerous occasions and would have MV-3 explicitly touch his/her genitalia.

    b.    That MASTERSON would communicate with MV-3 on live video and audio telephonic calls.

    c.    That MASTERSON was physically inside his/her mother's residence on one occasion.

    d.    That MASTERSON and him/her also engaged in unprotected sexual activities to include intercourse during his recent visit.

    e.    That MASTERSON captured pictures via his cellular telephone of the sexual activities with him/her and later showed them to him/her.

37.    On May 5, 2021, I obtained an arrest warrant for MASTERSON from the 91st Judicial District Court, Sault Ste. Marie, Michigan for violations of Michigan Compiled Law (MCL) 28.729 (1)(a) – Sex Offenders – Failure to Comply with Registration Act.  The Sault

Tribal Police discovered evidence that indicates that MASTERSON was residing within an unoccupied shed on the land held in trust by the Sault Tribe of Chippewa Indians in Sault Ste. Marie, Michigan.

38.     On May 6, 2021, I placed MASTERSON under arrest pursuant to the arrest warrant as previously documented in paragraph #37 of this affidavit.  During the arrest, MASTERSON was in possession of  the TARGET DEVICE and requested for his medication for the treatment of human immunodeficiency virus (HIV).  I seized the TARGET DEVICE and transported MASTERSON to the office of HSI Sault Ste. Marie.  During a custodial interview, MASTERSON made the following statements:

      a.     That he is homeless and lives in his pickup truck.

      b.     That his is infected with HIV.

      c.     That his prior convictions that caused his registration on the SOR concern an occasion when he engages in sexual activities with a minor child who was 12 or 13 years of age.

      d.     That he travelled to Sault Ste. Marie, Michigan to visit MV-1.

      e.     That he was inside of MV-1's residence on one occasion during this recent visit.

      f.     That he was in his "mid-twenties" or "thirties" when he first met MV-1 via social media and he/she was approximately 14 years of age.

      g.     That he identified MV-2 and MV-3.

      h.     That he confirmed that he sent the cellular telephone previously documented in paragraph #28a of this affidavit mailed to MV-1.

      i.     That he and MV-1 engaged in sexual activities during his recent visit.

j.      That MV-1 should be medically tested to determine if he/she contracted HIV from him.

39.     In May of 2021, Criminal Analyst Katheryn Good, assigned to HSI Sault Ste. Marie, Michigan, reviewed the extraction report as previously documented in paragraph #21 of this affidavit concerning MV-1's previously examined cellular telephone as documented in paragraph #15 of this affidavit.  CA Good discovered two images that depict MV-1 exposing one of his/her breasts and numerous images of males' and females' exposed genitalia.

40.     On June 17, 2021, Forensic Interview Specialist (FIS) Amy Allen, assigned to HSI Headquarters, Washington D.C., conducted another forensic interview of MV-1.  FIS Allen presented MV-1 with printed copies of an image that depicts his/her exposed breast, an image that depicts a female's genitalia and an image that depicts a male's genitalia.  MV-1 made the following statements:

a.      That he/she confirmed that the images that depict his/her exposed breast and the exposed female's genitalia are indeed of his/hers.

b.      That he/she confirmed that the image that depicts the exposed male's genitalia is MASTERSON's erect penis.

c.      That those images were previously sent/received between him/her and MASTERSON via their cellular telephones.

d.      That MASTERSON also purchased two adult "sex toys" via his/her Amazon account and had them sent to his/her residence.

e.      That MASTERSON had him/her masturbate with the "sex toys" and a bottle while he watched via a live vide telephone call.

f.      That MASTERSON made him/her watch him via live video telephone

calls while separately engaging in sexual activities with his identified former girlfriend and male roommate.

41.     Based on the information to my knowledge, training and experience in child exploitation and child pornography investigations and the experience and training of other law enforcement officers, I believe there is probable cause to believe that Christopher MASTERSON is a consumer of child pornography and that there will be evidence of child pornography on the TARGET DEVICE.  For the same reasons, I suspect that the TARGET DEVICE contains evidence of the sexual assault of MV-3.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

42.     Based upon my knowledge, experience and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to consumers of child pornography:

a.      Those who possess, receive and attempt to receive child pornography may receive sexual gratification, stimulation and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs or other visual media; or from literature describing such activity.

b.      Those that possess, receive and attempt to receive child pornography may collect sexually explicit or suggestive materials.  Such individuals oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the

selected child partner or to demonstrate the desired sexual acts.  They also engage in a process of grooming children to induce, entice, coerce, persuade, and use them to engaging in sexual activity, by establishing a relationship; providing gifts, lures, alcohol, and drugs; and desensitizing children to sexual material and sexual activity.

c.      Those who possess, receive and attempt to receive child pornography often possess and maintain copies of child pornography and child erotica for many years.

d.      Those who possess receive and attempt to receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment.  These collections are often maintained for several years and are kept close by to enable the collector to view the collection, which is valued highly.

e.      Those who possess, receive and attempt to receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.      Those who possess, receive and attempt to receive child pornography prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.      Those who possess, receive and attempt to receive child pornography are often interested in producing their own child pornography.  Digital cameras and cellular telephones with digital cameras make it very easy to produce new child pornography.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

43.     As described above and in Attachment B, this application grants permission to search for records and evidence that might be found on TARGET DEVICE, in whatever form they are found.  This warrant provides authority for me to forensically review, or seek the assistance of others in HSI or within other law enforcement agencies to assist in the forensic review of the digital devices described in Attachment A for the items listed in Attachment B.

44.     There is probable cause to believe those records authorized to be seized pursuant to Attachment B will be stored on the TARGET DEVICE for at least the following reasons:

a.     Based on my knowledge, training and experience, I know that cellular telephones are digital devices with computing capacity of computers.  Digital files or remnants of files within such digital devices can be recovered months or even years after they have been downloaded onto a storage medium, deleted or viewed via the Internet.  Digital files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operations, file system data structures and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the TARGET DEVICE was used, the purpose of their use, who used them and when. There is probable cause to believe that this forensic electronic evidence will be on the TARGET DEVICE because:

f.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record

additional information such as the attachment of peripherals, the attachment of external storage media and the times the digital device was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

       g.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

       h.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them and when.

       i.      The process of identifying the exact files, blocks, registry entries, logs or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

j.      I know that when an individual uses a digital device to access the Internet, including e-mail or instant messaging, to receive or distribute child pornography, the individual's digital device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for the fruits of the crime, and will contain evidence of the crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; records of internet discussions about the crime; and other records that indicate the nature of the offense.

## CONCLUSION

45.      Based on the information provided above, I respectfully submit that there is probable cause to believe the TARGET DEVICE contains evidence of child pornography in violation of federal law, including 18 U.S.C. 2252 and 2252A - Production, Distribution, Receipt and Possession of Child Pornography, 18 U.S.C. § 2241(c) - Aggravated Sexual Abuse, 18 U.S.C. 2422(b) - Coercion and Enticement and 18 U.S.C. § 2251(a) and (e) - Sexual Exploitation of Children.

46.      Accordingly, I respectfully request that this Court issue a search warrant for content of the TARGET DEVICE, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence, contraband and other items related to violations of federal law, including 18 U.S.C. 2252 and 2252A - Production, Distribution, Receipt and Possession of Child Pornography, 18 U.S.C. § 2241(c) - Aggravated Sexual Abuse, 18 U.S.C. 2422(b) - Coercion and Enticement and 18 U.S.C. § 2251(a) and (e) -

Sexual Exploitation of Children.

47.    If there is any child pornography found on any of the TARGET DEVICE, I intend

to maintain custody of the TARGET DEVICE as evidence of the offense, facilitating property,

and as property subject to forfeiture.